319-0387 in re Marriage of Barbara Ann Gavin, APALEE, and Joseph John Gavin, appellant. Mr. Reigerman and Mr. Pollack, I have to announce, first of all, that Justice Schmitz is on this panel. He, however, will not be participating with us today. He's had another engagement. So, um, here is Justice Schmitz and myself. Um, Justice Schmitz will read our, the transcripts of our argument today. And will be fully, um, a part of our decision. So. And even though you can't see me, I'm here. Justice Charter is here, but not. His voice is here. His face is not. So you have to hear me the whole time. I apologize for that. Mr. Reigerman, are you ready? Yes, I am, Your Honor. Alan Brueggemann for the appellant. May it please the court? Yes. Counsel. I represent Joseph Gavin, the appellant, who is a 74-year-old gentleman who has been divorced for over 30 years. He's even stopped paying child support almost 25 years ago. And then in 2019, he received a notice. And without a motion and without a hearing, a quadro was entered. And we asked the judge to reconsider. And the judge really didn't conduct a hearing on the issue of latches, didn't allow my client to present any evidence, or even allow him to show how he was harmed by latches or how he was prejudiced by the entry of a quadro 30 years after the dissolution of marriage judgment was entered. In fact, that quadro was not accepted by the employer plan. And the appellee's attorney submitted a second one with a notice of motion. And the trial judge did not vacate the first one, didn't modify the first one, but actually entered a second one. And Mr. Pollack has raised as a motion to dismiss that my appeal was not timely. We filed a motion to reconsider the first quadro that was entered and a notice of appeal after that. And then when the second one was entered, admitting that the first one was incorrect, we also asked the judge to vacate the first one, which he refused. He didn't modify the first one, he just entered a second one, and we did a motion to reconsider and a notice of appeal. So I don't want to not respond to the motion to dismiss. We think that the motion to dismiss is not well founded. With respect to our argument on the quadro itself and the errors that we think the judge committed, the language in the judgment of dissolution of marriage is paragraph four. And paragraph four is at best ambiguous. It talks about the pension of Mr. or the appellant, and it talks about it in terms of a vested pension and a present value of $7,500. That's one way of deciding how to divide a pension in divorce court, and it certainly was the more standard way of doing it back in 1987. The Hunt formula was from a case that was decided not long before this case, long enough, I guess, that lawyers probably knew what it meant, but probably the participants didn't. And this judgment, again, had conflicting language because it referred to the Hunt formula, and it also referred to the present vested cash value. Now, my client was prejudiced, and that's why we think Latches applies, because after 30 years, one of the attorneys, the one that drafted this judgment, perhaps, is deceased. The second attorney is no longer remember anything about these proceedings, and although he looked for his file, he didn't have any records, and he had no way of giving any supporting testimony for the appellant as to what that language meant or how it came to be. My client also, after 30 years, had some difficulty with the recall because he didn't fully understand the difference between the vested portion of $7,500 and the quadro, and he well thought he was supposed to give his wife a portion of the $7,500, whether that was a 50% distribution or if it was a Hunt formula distribution that would have reduced the longer he stayed in his pension. He wasn't clear on that, but my client never had an opportunity to tell the court… Ernie, I think Justice Farrer has a question. I'm sorry? May I ask a question, please? Okay, excuse me. How could your client have thought that if he never contributed anything to the $7,500 if that's what he thought over all these years, did he? Judge, he did offer to pay his wife that $7,500 or half of it in dealing with the other property elements of the judgment. They did have discussion, but then after another five or six years, his child support obligations ceased. He had no further obligations that he was aware of to his ex-wife, and they really had little contact. The divorce wasn't acrimonious, but afterwards, when the wife remarried, they stopped communicating at all. I think the prejudice issue is my client certainly would have been able to show evidence that this judgment, as entered, meant something different than what Judge Garcia did in entering a quadro 30 years after the judgment. Now, the other thing is my client was also prejudiced. I'm having trouble understanding. If that's the case, half of $7,500 or $7,500 was never actually given to the former spouse. Well, Judge, I think that's not 100% clear either because after 30 years, nobody has records of what happened. In fact, when Judge Garcia reviewed this case or ruled on the entry of the quadros, he didn't even have the case file. It was in archives, and it wasn't ever pulled up for him. The original appellee's attorney submitted an altered copy of the judgment. It had writing on it that wasn't in the original judgment, and in fact, the writing was not correct and accurate. I then furnished the court a certified copy of the judgment that wasn't altered or changed by hand. I don't mean anybody did it on purpose, but the copy that they used was not the actual judgment because it had some pen and ink markings on it that really called into question, in my mind, how those came to exist. And again, with one lawyer dead and the other one not knowing anything about it, we couldn't even raise that as an issue of how her copy of the judgment had other language on it. But I think my client did have a buyout of the residence, the marital residence, and he also made other contributions for other elements that weren't even covered in the judgment and may well have thought that he had paid her the half of $7,500, which would have been $3,750. Well, again, as you point out, that's a burden question, but when you say there's an ambiguity, there is a Hunt formula, and it's pretty clear what the Hunt formula is based on the case. And it was even around by the time your clients got divorced, right? It was, Judge, and I say it was fairly new at the time, not that new. But when I started practicing law, the Hunt formula wasn't in existence. And whether Mr. Snyder, the appellee's attorney who's now deceased, understood it completely, or Mr. Schlack, the appellant's attorney at the trial, understood it completely, it's not clear. Let me back up. The Hunt formula is not a complex formula. It's well set out what it is, and it's specifically referred to in the judgment. But, Judge, it also on page 6, I think it is, paragraph 4, with regard to the property settlement, it does refer to the present cash value of the pension. That has nothing to do with the Hunt formula. Exactly. Exactly. It has nothing to do with the Hunt formula. What they were saying is that at that present time, the pension had X value, but that had nothing to do with the Hunt formula that was specified in the judgment. That's what I don't understand. You know, where you're coming up with this ambiguity under the case law. Well, I think the judgment itself has an ambiguity. The first sentence says the party's here to agree that Joseph has a pension plan with his employer, IBM, and that the approximate present value of said pension is $7,500. Why is that not an appropriate way to divide the pension between a husband and wife when they get divorced? If we know what the present cash value is, give her the $3,750. They chose not to do that. They chose to go on and talk about dividing it up pursuant to the Hunt formula. Well, it's quite possible that nobody understood the Hunt formula as it applied to how much she got of his pension. If they weren't married the whole time he was in the pension, and if that wasn't clear in the judgment, which I don't think it is, it could be that the pension plan wasn't divided 50-50, but she got 50% of the marital portion, and it doesn't say the marital portion is $7,500. If you use the formula of the Hunt case to come up with that fraction, the number of months in the pension and the number of months that they're married, it could be that that formula would have merely reduced from $7,500 the wife's share to less than half. But that wasn't clear in the judgment, and it wasn't clear actually until maybe the second quadro was entered. I don't even know if it was clear when the second quadro was entered. But the point that I really am saying is Judge Garcia did not give my client an opportunity to have a hearing and decide whether Latches applied. First of all, if Latches applied, we wouldn't be fighting over what this language means. But if Latches doesn't apply, then what does this language mean? Because there certainly is an ambiguity in my opinion, and we tried to call that to the attention of Judge Garcia. Judge Garcia entered the first quadro on the presentation by the appellee's attorney without anything more. It was just a presentation of a quadro, and he signed it. And actually, there was a representation by the trial lawyer at that time who said that the pension plan approved the quadro. In fact, later, the pension plan disapproved the quadro, said it didn't have the appropriate language in it, and rejected it, which led to then the presentation of a second quadro. Not a corrected quadro, not an amended quadro, but a second quadro. And that was entered, and I objected to the first one being still floating around, if you will, still a valid court order. And I asked the judge to vacate that first one, and the judge refused to vacate the first one. So we have two quadros. One is honored by the pension plan, one isn't. But what happens if the court reverses this quadro decision and sends it back to trial court? Does the first quadro that's still floating out there, it's not been vacated? Who knows? The pension plan may start paying under that one. But my point is simply my client didn't have an opportunity to present his argument on how he was prejudiced by this, how this judgment was, in fact, which divorce courts talks of marital settlement agreements as contract. Contracts are interpreted by parole evidence when there's an ambiguity, and my client was deprived of the ability to really have any parole evidence, because one lawyer is dead, one lawyer doesn't remember anything, and the judge is long since retired who entered the judgment. And by the way, the court reporter was dead, so you couldn't even get a transcript of the court proceeding where the judgment of dissolution of marriage was approved, the parties testified, and it was entered. Her notes were never transcribed. No one can transcribe her notes. We tried to get those. So we have no record of the judgment being entered and what happened and who testified to what. 30 years later, we don't have one lawyer, he's dead, and another lawyer doesn't remember anything. And my client, frankly, at age 74 is not really versed in what happened 30 years ago when he got divorced. So it seems to me that latches must be considered, and second, the judge should conduct a full and complete hearing on whether my client is prejudiced, what the language of the contract means, and how it should be interpreted. And without two of the main parties, the lawyer that drafted it and the lawyer that represented my client at the time, it's really hard to address the intent of the parties when they entered into this contract, and specifically on page, I guess it's page 9, the language in paragraph 4 regarding his pension. Again, it recites the present cash value, and I can't for the life of me, in my practice, understand why you would put that in if you're doing the pension under a hunt formula and it's to be decided at the time the respondent retires. Now, another issue I'd like to- It's uncommon to have a mention of the present value of a pension even if they used a hunt formula, is it? No, it isn't, Judge. In my practice, I've not seen it except in this case. No, my point is the opposite. It's not uncommon to have what the present value is even if they used a hunt formula. Well, sometimes pensions aren't even vested when parties get divorced, and it's only later when they get vested, and so there is no present cash value. And I think, I literally think in this particular case, although we don't have any evidence of it, that it wasn't vested, and so there wasn't really a present cash value at the time. This is a deferred payment pension plan. It's a defined benefit. It's not a 401K. It's not an IRA. And so the present cash value is usually only recited when you're doing a division of the present cash value because the parties have been married and the pension is a marital property. I'm sorry, my time's up. Thank you very much, gentlemen. Thank you, Mr. Bergeman. Mr. Bolling? Thank you. May it please the court. My name is Zach Pollock. I represent Upelli, Miss Gavin Council. I just want to hop right in. As far as the pension being vested or not at the time of divorce, it was not vested. There was live testimony from Mr. Gavin under direct from Mr. Bergeman. This is page six of the report of proceedings. Mr. Bergeman asked Mr. Gavin, in 1987, were you working for IBM? Answer, yes, I was. Question, did you have a vested pension at the time? Answer, no, I did not. So at the time of the divorce, the pension was not vested. Now hopping into whether there's actual ambiguity in the language, I simply don't see it. You've got a clause which does say that the approximate present value of the pension is $7,500. If they intended to split it 50-50 with that value, even though it was not vested at the time and it's only an approximate value, that paragraph would have stopped right there. There would be no reason to continue to mention the Hunt formula. The issue with that is, let's say you find it to be ambiguous. We have to go to the rest of the document. There's no other mention of the pension anywhere else in the document. There's no other mention of any sort of offset to pay Miss Gavin for that $3,750 she'd be entitled to. So even if you do find that clause to be kind of ambiguous, if you look at the rest of the document, it's clear that they did intend to use the Hunt formula. Because there's simply no reason for them to have that $7,500 in there and then not have it somewhere else if they did intend to split it 50-50 based on that amount. So I think there's no ambiguity. I think that the trial court was well within its right of entering a quadro because in that clause, there's no specific trigger that Miss Gavin has to do in order to have that quadro entered. She doesn't have to give Mr. Gavin notice, anything like that. It's simply a property right that she was given in the Merrill settlement agreement. So there's no ambiguity. If there is ambiguity, if you do go to the typical ways that you construct a contract, you look at everything else, it's pretty clear that they intended to use the Hunt formula because there's simply no other mechanism to compensate Miss Gavin for her portion of the pension in that document. As far as latches are concerned, latches, you have to have an unreasonable delay in enforcing some sort of right. And the second part is that you have to have prejudice. Now, Miss Gavin did wait for quite a bit of time to enter this quadro. However, I don't think that there's any material prejudice to Mr. Gavin. I actually think he received a benefit due to her delay. The fact is, Mr. Gavin retired, I think, 15 to 20 years prior to Miss Gavin bringing it into court and trying to enter the quadro. So that entire time, she was missing out on payments that she rightfully could have received from Mr. Gavin's pension. So he's got about 20 years of income, which technically wasn't even his. Miss Gavin did not ask for repayment of that. She didn't ask for interest on any amounts. She simply asked that the quadro were entered and that from that date forward, she be given the rightful amount that she was guaranteed in the marital settle agreement. So in that sense, there's no prejudice. Mr. Bergerman seemed to suggest that Mr. Gavin was somehow prejudiced because of the inability to investigate the sources of transcripts. He didn't have the opportunity to consult his attorney. He didn't have the opportunity to fully challenge these things at a hearing because Miss Gavin waited so long and either transcripts weren't available, lawyers had either passed or didn't remember the issue. But that kind of neglects the fact that Joseph at any time could have brought a motion challenging that clause. He didn't have to wait for Miss Gavin to try and enter the quadro. It's a situation where, you know, he is making the assumption that the only way to challenge it is to have that quadro attempt to be entered. I don't think that's the case. As far as there's another argument that they made about prejudice that Mr. Gavin somehow relied on this income and made decisions based on his retirement that will negatively impact him now because he's not receiving that full portion that Miss Gavin is now receiving. And that also kind of goes against what the actual document the MSA says that Miss Gavin doesn't have to do anything to trigger this right. There was testimony from Mr. Gavin saying that she never told him that she waived her right to the pension. So he's not just because he relied on the income that he wasn't entitled to doesn't mean that he was prejudiced. Once that quadro was entered, he essentially received a windfall in this case. Finally, I've got the issue of jurisdiction. Mr. Brueggemann kind of went over the way that this went down. Miss Gavin filed that original motion to enter the quadro. Mr. Brueggemann filed a motion to reconsider. The court eventually held a hearing on Mr. Brueggemann's first motion reconsider that motion and the hearing was held on May 23rd. I believe Mr. Brueggemann was in court with his client. His client actually testified. And on that date, the trial court denied Mr. Gavilan's motion to reconsider. So at that point, I believe that's when the 30 days started to run to file the notice of appeal. Mr. Brueggemann is correct that there were some errors in the original quadro that Miss Gavin's trial counsel submitted, but that was known to everyone on the date of that argument on May 23rd. It was actually brought to the attention of the judge. What the error was is simply a paragraph was deleted. Based on that, IBM rejected that quadro. Again, Miss Gavin's trial counsel did bring to the court's attention that there was an issue and that a second quadro would need to be entered. At the conclusion of that May 23rd hearing, Mr. Brueggemann requested seven days to review the new quadro. Eventually, that quadro was entered on May 31st. June 17th, Mr. Brueggemann filed a second motion to reconsider the entry of that second quadro. Again, made the same arguments regarding latches, ambiguity. And on June 27th, the trial court denied that second motion. The notice of appeal was filed July 8th, which was 46 days after the original date of hearing. Now, my argument is that once the trial court denied that original motion to reconsider, that was the final and appealable word. The only thing left to do was to enter that quadro. I understand that there was a second quadro entered due to some issues with the language, but everyone was aware of that the day that the court made that ruling. So the fact that Mr. Brueggemann filed a second motion to reconsider, it didn't raise any issues. It simply raised the same issues and objected to the entry of the second quadro, which did contain the correct language. I don't believe that told the 30-day period, and Mr. Brueggemann didn't file any sort of motion to file a notice of late appeal. So I do believe the 30-day limit is jurisdictional. Once you get beyond that, if you don't file the necessary motions to extend that deadline, I think you're out of luck, and I do think the court does not have jurisdiction. With that, I'll thank you for your time, and I'll rest. Thank you, Mr. Pollard. Judge Carter, do you have any questions? I don't have any. Well, I do have one question. The marital settlement agreement that was part of the judgment, and I think it's Article 4, Section 4 or something, refers to the entry of a quadro, does it not? Yes, it does. The language is, the parties here to agree to assist and cooperate in obtaining the entry of a qualified domestic relations order prepared by legal counsel for Barbara subsequent to the entry of a judgment of dissolution of marriage. Thank you. I have no other questions, Justice. Thank you, Judge Schroeder. Mr. Brueggemann, any reply? Judge, in response to your question, Judge Carter's question, counsel for the appellee in the entry of the quadro never asked for any participation by Mr. Gavin. They never gave him any opportunity to participate in the submission of the quadro or review of the quadro before it was entered. So, I don't think it should be held against my client that he didn't assist and cooperate because he wasn't ever asked to assist and cooperate. It just was sprung on him 30 years after the judgment was entered. The other part is the... Excuse me, Judge Schroeder, go ahead. No, go ahead, Justice. We signed the stipulated order initially, the original divorce separation agreement. It does provide for the entry of a quadro, but it doesn't say she can enter 30 years later. And there's plenty of cases that deal with waiting and sitting on your haunches and lashes, barring you from acting. Now, I would suggest that there's another issue about Mr. Gavin, the appellant's prejudice. If he knew there was a quadro entered when he retired, he might not have retired at that time. When he retired, he assumed he was getting his entire pension because that quadro had not been entered. And it was 15 years after he retired that she finally submits it, maybe even 17 years later, that she submits this quadro without warning, without any notice, without any cooperation or request for cooperation from Mr. Gavin, the appellant. Was there a request for a retroactive quadro payment? Judge, there hasn't been yet. Okay, there hasn't been yet. I don't know if you're going to consider latches to be applicable should she ask for one in the future or that she's barred from asking for one now since she's asked for the quadro and hasn't included that. I don't know what the trial court will do, and I don't know what the appellate court will do, and I don't know what the appellee will do. I can't predict the future, but Mr. Gavin does have a prejudice because he retired when he did, not knowing he was going to have to give this money to his wife from his pension. Had he stayed longer, if you really do apply the Hunt formula, the Hunt formula would mean her share was going down as his pension went up. So if he had stayed in another 15 years, instead of getting a quarter of the pension, she might have only gotten a sixth of his pension. And that might have been something he could have intelligently considered and planned on and dealt with had a quadro been timely entered. Again, there was a transaction with the sale of the house, and there was a buyout. There was a contribution to college expenses, and my client, because no quadro had been entered, paid a greater portion than he was ordered to pay. So there was a lot of detrimental reliance by my client on the fact that she hadn't gotten a quadro entered and hadn't been seeking any of his pension. He made a lot of decisions in that 15 years after the divorce, after he retired, based on the fact that she hadn't filed a quadro, hadn't sought part of his pension. So he is prejudiced by the late entry. And by the way, to enter something that late under the doctrine of latches, the appellee was required to show why she delayed so long. She produced no evidence of why she delayed so long. And she's required to show that there's some excuse for her delay in acting. So thank you very much. I'd ask that you reverse this decision. And if you're going to send it back for hearing, that you send it to a different trial judge. Thank you, Mr. Bergman. Thank you both for your arguments today. We will take this matter under advisement to pass you the written disposition within a short time. So again, thank you both. Thank you very much. And thank you for accommodating us on Zoom. It's a nice feature. Our pleasure. Thank you.